IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>CONSTANCE ARRINGTON. | CRIMINAL ACTION<br><br>NO. 24-CR-127 |

**Baylson, J.**                                                                                          **December 10, 2024**

## MEMORANDUM

Defendant Constance Arrington asks this Court to suppress evidence that will be used against her at trial. She argues that police officers unlawfully stopped and searched her car without probable cause when they discovered cocaine in the trunk. Because the officers' actions were lawful and supported by probable cause, Defendant's motion is **DENIED**.

### I. PROCEDURAL HISTORY

On March 28, 2024, the Government indicted Constance Arrington, Defendant, for illegally possessing with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A). ECF 1-2. Jury trial is set for January 21, 2025. ECF 32.

On July 30, 2024, Defendant filed a Motion to Suppress admission of the alleged cocaine into evidence. Def. Mot. to Suppress, ECF 18. Defendant advances two principal arguments. First, Defendant argues that the officers did not have reasonable suspicion or probable cause to stop her car on March 15, 2024. Id. at 6–7. Second, Defendant contends that the officers impermissibly searched her vehicle during the traffic stop because her consent to search was given involuntarily. Id. at 9–10.

On August 12, 2024, the Government responded to Defendant's motion, countering that there was reasonable suspicion and probable cause to stop Defendant's car, Defendant provided

voluntary consent to search her vehicle, and alternatively, the evidence (i.e., the cocaine) would have been inevitably discovered. Gov. Resp., ECF 23.

On October 7, 2024, this Court held an evidentiary hearing in which the Government presented four witnesses: Detective Antonio Rodriguez, Special Agent Santino Costobile, Task Force Officer James Chabot, and Police Officer Robert Benson. The parties stipulated to admitting several exhibits at the hearing and showed body camera footage from Officer Benson. Per the Court's request, both parties also submitted post-hearing supplemental briefing. Gov. Supp. Resp., ECF 29; Def. Supp. Resp., ECF 43.[1]

## II.   FACTUAL FINDINGS

Officers from the Drug Enforcement Administration ("DEA") connected Defendant to a large drug trafficking organization (the "Lopez DTO") in the months preceding the March 15, 2024 stop and search of Defendant's car.

Detective Antonio Rodriguez, an officer with the Los Angeles Police Department ("LAPD"), was assigned to a DEA joint task force in 2016 where he began primarily investigating large-scale drug trafficking organizations, including the Lopez DTO. Tr. 10:18–11:6, 12:23–13:2. Through study of the Lopez DTO's patterns, Detective Rodriguez learned that the Lopez DTO smuggled large amounts of cocaine from Mexico into Southern California through points of entry and then transported the cocaine to its customer bases in east coast and midwestern states.[2] Tr. 13:13–14:6.

---

[1] At the hearing, the Court directed the parties to limit briefing to the issue of whether the officers had probable cause to search the car, and not to focus on the voluntariness of the consent to search. Supp. Hearing Tr., ECF 40, at 198:1–6 ("Tr.").

[2] In 2021, officers seized over $12 million, hundreds of kilos of cocaine, fentanyl, and heroine, and arrested over 20 Lopez DTO customers in Baltimore. Tr. 17:15–23.

As part of the Lopez DTO investigation, Detective Rodriguez and his partner, DEA Special Agent ("SA") Kyle Hegarty, surveilled Maria Delia Cota, the former girlfriend of one of the heads of the Lopez DTO. Tr. 18:20–19:2, 20:19–25. On September 28, 2023, Detective Rodriguez and other agents tracked Ms. Cota to a Los Angeles café meeting with a Patrick Johnson, an individual who Detective Rodriguez subsequently learned had an extensive rap sheet for drug-related offenses, including a conviction for a federal drug trafficking offense. Tr. 22:23–23:2, 23:9–21, 25:2–17; Gov. Ex. 1B. SA Hegarty overheard Ms. Cota discuss with Mr. Johnson, albeit without any context, travel plans to Mexico and processing new phones. Tr. 24:17–25:1, 52:4–17. Detective Rodriguez testified that based on his experience, he suspected Mr. Johnson was connected to the Lopez DTO and was working with Ms. Cota to service a new customer base. Tr. 25:22–26:7.

Detective Rodriguez and SA Hegarty thereafter followed Mr. Johnson to a residence located at 1321 Buckler Avenue in Inglewood, California. Tr. 26:10–12. Utility bills for 1321 Buckler were registered to a James Davis, which Detective Rodriguez determined to be a fake name. Tr. 26:25–27:6. Detective Rodriguez, however, traced a phone number registered to the utility account at the property to Mr. Johnson. Tr. 27:10–14. Immediately upon arriving at the house, Detective Rodriguez and SA Hegarty noticed a female arrive and enter the residence; they subsequently learned that this individual had prior arrests for cocaine trafficking. Tr. 27:17–28:2.

Weeks later, on December 15, 2023, agents installed covert pole cameras to surveil 1321 Buckler, and observed that nobody lived in the residence or stayed in the house for more than 24 hours. Tr. 28:5–10, 54:9–10. They also observed Mr. Johnson briefly come and go from the property on multiple occasions carrying various sized bags.[3] Tr. 28:11–29:3; Gov. Exs. 1D, 1E.

---

[3] Detective Rodriguez testified that he spent five years learning how illegal drugs are packaged and shipped through the U.S. Mail. Tr. 10:2–10.

On one occasion, Mr. Johnson exited the house carrying duffel bags appearing to be weighted down, which Detective Rodriguez believed to be containing cocaine or bulks of cash based on his experience studying the Lopez DTO patterns. Tr. 29:22–30:16; Gov. Ex. 1H.

While surveilling 1321 Buckler, Detective Rodriguez also observed the Defendant enter the house for short periods, always carrying just a backpack. Tr. 31:1–11, 31:15–17. On one occasion, Defendant got out of a yellow cab, entered the house, changed clothes, and then got into a parked Audi and left. Tr. 31:4–11.

Between December 2023 and March 2024, based on a tracking of Defendant's phone, officers discovered that Defendant took long flights almost every other week from Los Angeles to Kansas City and to Philadelphia for short stays of less than 24 hours. Tr. 32:3–12, 33:18–19. On one of these quick trips to Philadelphia in January 2024, Philadelphia DEA agents stopped Defendant at the Philadelphia airport and searched her backpack, however agents did not discover anything of evidentiary value. Tr. 33:8–12, 74:15–18. At the stop, Defendant was carrying a backpack but no carry-on bag or checked luggage. Tr. 74:9–14.

On March 8, 2024, Defendant travelled back to Philadelphia. Tr. 33:20–25. The day before her trip, SA Hegarty in California debriefed SA Costobile of the Philadelphia DEA office about Defendant and her travel patterns. Tr. 34:3–5, 83:10–24. Specifically, SA Hegarty told SA Costobile that Defendant made frequent short trips to Philadelphia with no checked bags, would fly back the same day, and that pings on Defendant's phone—GPS tracking of Defendant's phone's location, Tr. 48:20–24—showed a pattern of Defendant traveling to specific areas in Pennsylvania such as Bala Cynwyd. Tr. 83:18–24.

Upon Defendant's arrival in Philadelphia on March 8, 2024, SA Costobile and his team of agents observed Defendant exit the plane carrying a black backpack. Tr. 84:13–20. They followed

4

Defendant through the airport where she walked past baggage claim without stopping and got in an Uber at which point the agent-team lost track of her. Tr. 34:10–12, 84:21–85:7, 108:21–109:8. SA Costobile relayed this information back to the officers in California. Tr. 85:8–10.

At some point after Defendant's March 8th trip, Detective Rodriguez observed Mr. Johnson moving empty duffel bags from the garage into the house at 1321 Buckler and then taking the duffel bags back out. Tr. 34:20–24. Detective Rodriguez had several calls with Philadelphia DEA and warned them Defendant was planning to come back to Philadelphia, and that she would be meeting with someone to exchange duffel bags or boxes. Tr. 35:9–21, 67:6–15, 68:3, 69:13–20. Detective Rodriguez gave local Philadelphia agents the green light to stop Defendant in Philadelphia but suggested that officers conduct a walled-off stop—a law enforcement measure to erect a metaphorical wall between the Philadelphia stop and the California investigation to prevent Defendant from tipping off the Lopez DTO by phone about the investigation.[4] Tr. 36:4–8, 36:25–37:9, 40:2–13.

SA Costobile spoke to SA Hegarty on March 14, 2024, where he learned about Defendant's plan to return to Philadelphia and that California agents suspected she may be involved in a Los Angeles organization moving bulk drugs into Philadelphia. Tr. 85:15–86:9, 107:20–25. SA Costobile was provided a copy of a search warrant issued by a California state court for phone pings for two target numbers. Tr. 85:18–25; Gov. Ex. 1A. SA Costobile testified that his team planned to conduct a walled-off stop if they observed Defendant engaged in suspicious behavior, such as load boxes that could conceal drugs, and if a walled-off stop were not possible, they would have the K-9 dog ready and were prepared to apply for a search warrant. Tr. 86:12–87:6.

---

[4] Agents did not conduct a walled-off stop when Defendant was stopped the first time at the Philadelphia airport in January 2024. Tr. 62:19–63:2.

5

On March 15, 2024, Defendant again exited the plane at the Philadelphia airport with just a black backpack and no other luggage. Tr. 87:11–17. This time, Defendant rented a car and drove from the airport in Philadelphia into New Jersey. Tr. 88:14–18, 111:12–18. Defendant stopped at a Wegmans market in Cherry Hill, NJ, where SA Costobile observed Defendant examining her surroundings, checking vehicles around her, and looking behind her. Tr. 89:10–16. Defendant had a phone in her hand at the time. Tr. 89:19–20. Defendant was in Wegmans for less than five minutes and left the store without carrying anything other than her phone. Tr. 90:10–11, 18–24. SA Costobile—a member of a task force comprised of a team of agents from the DEA, Homeland Security Investigations ("HSI"), and Philadelphia Police Department ("PPD") investigating state and federal drug trafficking, Tr. 83:2–5—testified that he believed Defendant's behavior was consistent with conducting counter-surveillance techniques to avoid detection. Tr. 91:6–9.

Defendant drove a short distance from Wegmans to a parking garage on Haddonfield Road in New Jersey. Tr. 91:12–19, 112:8. Defendant walked into an office rental building, spent approximately 30 minutes inside, and came out wheeling a dolly cart loaded with three large cardboard boxes that, SA Costobile testified, appeared large enough to contain retail-level drugs. Tr. 91:22–92:15, 112:11–21. Defendant placed the boxes into the trunk of her rental car and headed back towards Philadelphia. Tr. 92:19–22, 93:2, 112:22–113:10.

At this point, SA Costobile planned to have a Philadelphia police unit, as opposed to a DEA agent, conduct a walled-off stop of Defendant's vehicle to protect the Los Angeles investigation. Tr. 93:19–94:8. To effectuate the walled-off stop, Task Force Officer ("TFO") James Chabot conveyed information about Defendant's vehicle to the central Philadelphia dispatcher and requested that a marked PPD unit stop the car. Tr. 94:9–16, 113:25–114:2, 150:21–

23. TFO Chabot did not provide any other information about the stop because the situation was fast moving. Tr. 114:17–25, 115:18–25, 150:24–25.

PPD Officer Robert Benson along with other police vehicles stopped Defendant's car right off the Ben Franklin Bridge at the entrance to highway 676 West. Tr. 115:7–13, 152:6–13. The initial stop lasted under five minutes. Tr. 131:4–11, 160:7–16. Officer Benson instructed Defendant to drive to the next exit because they were blocking traffic at their current location. Tr. 152:21–25.

At the second location, Officer Benson reapproached Defendant's car and asked her questions about where she was travelling. Tr. 155:4–6. Defendant told Officer Benson she was getting dinner with a friend or family member but could not specify at which restaurant. Tr. 155:8–11. Officer Benson returned to his vehicle and spoke to TFO Chabot who had been following closely behind as the traffic stop was unfolding. Tr. 116:20–117:6, 156:4–6.

TFO Chabot briefed Officer Benson behind Defendant's vehicle about the purpose for the stop. Id. To preserve the walled-off stop and in an attempt to explain why multiple police vehicles pulled Defendant over, TFO Chabot asked Officer Benson to tell Defendant a fabricated story, that a dark colored SUV may have been involved in a road rage incident and that the suspect had been seen pointing a gun. Tr. 117:12–16, 117:19–23, 156:10–21. TFO Chabot feared that if Defendant suspected it was a narcotics stop, she could flee and compromise the California investigation. Tr. 117:24–118:6. TFO Chabot testified that his goal was to obtain Defendant's consent to search her vehicle, but if she refused, he would have seized the car and applied for a warrant to search. Tr. 120:19–121:3.

Officer Benson relayed the ruse to Defendant. Tr. 156:19–21. Officer Benson asked for Defendant's consent to search the car for a firearm or for anything else. Tr. 156:22–25. Defendant

7

gave consent to search the car, and she willingly stepped out of the vehicle. Tr. 123:9–14, 157:5–11. Immediately after stepping onto the sidewalk, TFO Chabot observed Defendant on her cell phone, which he later confiscated. Tr. 124:13–18, 125:22–126:3. TFO Chabot spoke to SA Michael Beck who was an agent searching Defendant's vehicle. Tr. 123:9–14. SA Beck opened the trunk of Defendant's vehicle, saw the three boxes, and discovered cocaine inside one of the boxes. Id.; Tr. 127:5–10.

### III. DISCUSSION

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. AMEND. IV. When law enforcement executes a seizure without a warrant grounded in probable cause, the government must prove that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). If officers obtained evidence because of a Fourth Amendment violation, moreover, that evidence must be suppressed. United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006).

#### A. Reasonable Suspicion

Terry stops refer to a category of brief, investigatory stops undertaken by the government when an officer has a reasonable, articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). To meet the standard for reasonable suspicion, "an officer's reliance on a mere hunch is insufficient," however, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002) (internal quotation marks and citation omitted). Courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion" due to their "experience and specialized training to make inferences from and deductions about

the cumulative information available to them that might well elude an untrained person." United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018) (internal quotation marks and citation omitted).

### B. Probable Cause

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002). The well-established automobile exception, however, permits law enforcement to search vehicles without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." United States v. Donahue, 764 F.3d 293, 299–300 (3d Cir. 2014) (internal quotation marks and citation omitted); see also Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment [ ] permits police to search the vehicle without more.").

"[P]robable cause is a 'fluid concept,' turning on 'the factual and practical considerations of everyday life,' which requires only a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Caesar, 2 F. 4th 160, 171 (3d Cir. 2021) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including containers, packages, and trunks. United States v. Ross, 456 U.S. 798, 821–24 (1982).

## IV. APPLICATION

### A. Officers Had Probable Cause To Stop And Search Defendant's Car

At the evidentiary hearing, DEA officers testified to months-long physical and electronic surveillance of Defendant, in which the DEA officers collectively (1) connected Defendant to a large-scale drug organization operating out of Southern California with a customer base in east coast states; (2) tracked Defendant's frequent quick travel to Philadelphia with only a backpack

9

and no luggage; and (3) observed Defendant in the moments before the traffic stop at issue load three large cardboard boxes into the trunk of her rental car while surveying her immediate surroundings. The Court finds all four officers' testimony to be credible,[5] and taken together, these factors establish that the officers had probable cause to stop and search Defendant's vehicle. See Maryland v. Pringle, 540 U.S. 366, 371 (1989) (holding that the probable cause standard "deals with probabilities and depends on the totality of circumstances").

### 1. Officers Connect Defendant To The Lopez DTO In California

Detective Rodriguez's testimony sufficiently connected Defendant to the Lopez DTO—a large-scale drug trafficking organization—in the months preceding the traffic stop in Philadelphia on March 15, 2024.

Detective Rodriguez observed Defendant at 1321 Buckler Avenue in Inglewood, California on multiple occasions always carrying a backpack. Tr. 31:3–17. Officers suspected 1321 Buckler was used by the Lopez DTO to store narcotics based on several observations, including that nobody lived in the residence or stayed there for more than 24 hours, utility bills were registered to a fictitious name, and individuals with past drug convictions visited the property. Tr. 26:25–27:6, 28:5–10.

1321 Buckler was also associated with Patrick Johnson, an individual who frequented the property carrying various sized bags, including duffel bags appearing to be weighted down with cocaine or bulks of cash. Tr. 28:11–29:3, 29:22–30:16, 54:9–10; Gov. Exs. 1D, 1E, 1H. Mr. Johnson has multiple prior convictions for drug-related offenses and was tracked meeting with

---

[5] LAPD Detective Rodriguez testified to his involvement in thousands of narcotics investigations as a member of a DEA joint task force targeting large-scale drug trafficking organizations and years studying the Lopez DTO and its patterns. Tr. 10:18–13:2. Special Agent Costobile and TFO Chabot also have experience investigating drug cases with the DEA. Tr. 82:22–83:5, 106:21–107:7, 181:9–19. Officer Benson has been employed by the PPD for over six years. Tr. 150:1–2.

Maria Delia Cota—the former girlfriend of a founder of the Lopez DTO, Gov't Ex. 1B—at a Los Angeles café discussing travel to Mexico and processing new phones. Tr. 22:23–23:2, 23:9–21, 24:17–25:17, 52:4–17.

### 2. Defendant Makes Frequent Short Trips With No Luggage

Defendant made frequent short trips from Los Angeles to Philadelphia—an area with known Lopez DTO customer bases, Tr. 13:13–14:6—with only a backpack and stayed for less than 24 hours.[6] Tr. 32:3–12, 33:18–19. California DEA agents briefed local Philadelphia DEA agents about Defendant and her travel, including their suspicion Defendant was transporting bulk quantities of illegal drugs for the Lopez DTO. Tr. 35:9–21, 67:6–15, 68:3, 69:13–20, 85:15–86:9, 107:18–25. Detective Rodriguez authorized the Philadelphia DEA to stop Defendant's vehicle and requested that local law enforcement conduct a walled-off stop to preserve the ongoing California investigation. Tr. 36:4–8, 36:25–37:9, 40:2–13.

### 3. Defendant's March 15, 2024 Trip to Philadelphia

In addition to Detective Rodriguez's observations of Defendant, SA Costobile and TFO Chabot both testified that they physically surveilled Defendant on March 15, 2024, drive a rental car from the Philadelphia airport to a Wegmans market in Cherry Hill, NJ. Tr. 88:14–18, 111:12–18. She then went to an office building in Haddonfield, NJ where she loaded three large boxes into the trunk of her car, all while behaving consistent with a person suspiciously surveilling their surroundings. Tr. 89:10–16, 91:22–92:15, 112:11–21.

At the time of these observations, both SA Costobile and TFO Chabot were aware of Defendant's suspected ties to the Lopez DTO and that California DEA agents believed she was

---

[6] Defendant's travel patterns are consistent with Detective Rodriguez's testimony that Lopez DTO couriers would handle the drugs in Los Angeles and would fly to customer source cities to receive the drugs for distribution. Tr. 16:13–17:5.

transporting cocaine to Lopez DTO customers.  Tr. 85:15–86:9, 107:18–25.  Further, SA Costobile was aware that location data from Defendant's phone indicated that she had on past trips travelled to the Bala Cynwyd, Pennsylvania area.  Tr. 93:3–13.

It is well recognized that "a police officer may draw inferences based on his own experience in deciding whether probable cause exists."  Ornelas v. United States, 517 U.S. 690, 700 (1996).  Here, SA Costobile and TFO Chabot drew from the totality of these factors to reasonably infer that Defendant was transporting retail-level narcotics in the trunk of her car.  In other words, the officers not only had reasonable suspicion, but also probable cause to stop Defendant's vehicle when she was traveling over the Ben Franklin Bridge from New Jersey to Philadelphia (in the direction of her past phone pings),[7] and to search the car for the three large boxes they saw her place in the trunk.

### B. The Walled-Off Stop Was Reasonable

The DEA agents' instructions to Philadelphia Police to conduct a walled-off traffic stop in Philadelphia and to fabricate a story to conceal the true purpose for the stop was reasonable under the circumstances.  See United States v. Chavez, 534 F.3d 1338, 1341–42 (10th Cir. 2008) (upholding a search by an officer that supplied a cover story to stop a vehicle because "disguising the stop as a traffic stop was a valid law enforcement tactic to ensure…the integrity of the DEA investigation" (internal quotation marks and citation omitted)).  In addition to Detective Rodriguez's request that officers in Philadelphia conduct a walled-off stop, Tr. 36:25–37:9, 73:18–23, both SA Costobile and TFO Chabot testified that they feared Defendant could have compromised DEA's longstanding investigation into the Lopez DTO by tipping off the Lopez DTO about the narcotics stop in Philadelphia.  Tr. 93:19–94:8, 117:24–118:6.  Indeed, they both

---

[7] SA Costobile testified he believed Defendant could have been travelling to Bala Cynwyd after leaving Haddonfield for the Ben Franklin bridge because phone pings previously located her in the Bala Cynwyd area.  Tr. 93:3–13.

observed Defendant on her phone multiple times while picking up the three boxes in New Jersey. Tr. 89:17–20, 112:13–17.

Defendant challenges the traffic stop as a mere pretextual "fiction concocted by the DEA agent" without any actual traffic violation, ECF 18 at 7, and while that may be true, the Philadelphia police officers needed no independent basis to stop Defendant's car. The Third Circuit has explained that under the "collective action" doctrine, "the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest," particularly as "it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis." United States v. Whitfield, 634 F.3d 741, 745–46 (3d Cir. 2010); United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause."). Importantly, and consistent with a walled-off stop, TFO Chabot testified that the situation was fast moving and he did not have time to explain the basis for the stop over police radio to local PPD officers. Tr. 114:3–25; see United States v. Williams, 627 F.3d 247, 253 (7th Cir. 2010) ("[A]pplication of the collective knowledge doctrine is unaffected by an officer's use of a cover story to disguise a stop as a mere traffic stop.").

## V. CONCLUSION

The Court finds based on the totality of the circumstances that officers had probable cause to believe Defendant was carrying illegal drugs in her rental car for the Lopez DTO. For all the foregoing reasons, Defendant's motion to suppress is **DENIED**.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\Criminal Cases\24cr127, USA v. Arrington\24-cr-127 Memorandum Mot. to Suppress.docx